DELAWARE INSURANCE COMPANY OF PHILADELPHIA v.
P. D. HARRIS ET AL.

Decided June 8, 1901.

**1.—Fire Insurance—Limitation of Agent's Authority.**

The fact that one applying for a policy of fire insurance did not read the application and knew nothing of any limitations therein of the agent's authority is held not sufficient, under the circumstances of this case, to exempt him from the terms of the contract of insurance as made; and where he must, as here, be held to know the extent of the agent's authority, he could not avoid the force of the terms of the contract upon anything said or done by the agent outside his expressly delegated authority as shown by the contract itself.

**2.—Same—Apparent Scope of Authority—Want of Notice.**

The rule that notice of any matter to the agent taking the application is notice to the company, applies only where the agent was acting in the apparent scope of his authority, and no notice of his real authority, if limited, was given to the insured.

**3.—Same—Agent's Knowledge of Facts Not a Waiver.**

The insured having been put upon notice that the issuance of the policy was to be based solely upon the statements in the application, and that the agent taking it had no power to waive the conditions of the policy, it was his duty to see that the statements made were correct, and not having done so, he can not claim that the conditions are waived because the agent knew the facts.

**4.—Same—Statute as to Limiting Agent's Power Not Applicable.**

Article 3093, Revised Statutes (a revenue act passed in 1879), applies only as far as relates to liabilities, duties, requirements, and penalties set forth therein, and can not be held in this case to prevent the insurance company from limiting the power of its soliciting agent to bind it by notice of any information received in procuring the contract of insurance.

**5.—Same—Warranties or Representations—Rule of Construction.**

Where it clearly appears from the terms of the contract that the statements of the insured are to be treated as warranties, then, if false, the policy becomes nonenforceable, and whether such statements were made in good faith or are material to the risk is of no consequence; but where there is language in the contract which will warrant the inference that a forfeiture will not be insisted upon where the statements, though false, are not material to the risk, such statements will be construed as representations, and will not forfeit the policy unless material to the risk.

**6.—Same—Warranty Limited to Material Matters.**

Where a fire insurance policy contained a provision that "this entire policy shall be void if the insured has concealed or misrepresented in writing or otherwise any material fact or circumstance concerning this insurance or the subject thereof," it was not intended to make the binding force of the policy dependent upon the absolute truth of each statement, but its force was dependent upon the statements being substantially true; and in such case the statements were representations, and not warranties.

**7.—Same—Statements Held Substantially True.**

Where the insured, in his application for an insurance policy on gin machinery, stated that the boiler had been in use two years, the engine three years, and that the three gins in use were new, while in fact the machinery had been in use for a longer period, but all of it had been reworked, refitted, rebuilt, and made practically as good as new, and was of the value stated, the court was warranted in finding that the statements were substantially true.

**8.—Same—Noncompliance Held Not a Breach, Because Not Material.**

A policy of insurance required the insured to keep three barrels filled with water and two buckets with each barrel at all times in the gin room, and this was done during the time the gin was in operation, but at the time of the fire the gin was not in operation, and had not been for some time, and the barrels had become dry and incapable of holding water. It was not shown that the failure to have barrels of water in the gin contributed to the loss, as it did not appear that any one was present at the time of the fire. Held, that there was not such a breach of the contract as would prevent a recovery.

**9.—Same—Misrepresentations Not Material—Mortgage Not Disclosed.**

Where plaintiff, in obtaining insurance on gin machinery worth $3200, and which he had purchased at second hand, failed to disclose that there was a chattel mortgage for $75 on one of the articles, a cotton press, such mortgage being unknown to him at the time, his failure to disclose its existence did not render the policy void. Following Bills v. Insurance Company, 87 Texas, 547.

Appeal from Hunt. Tried below before Hon. R. L. Porter, Special Judge.

*Crane & Greer,* for appellant.

*Lee A. Clark* and *Craddock & Looney,* for appellees

RAINEY, CHIEF JUSTICE.—We adopt the conclusions of fact of the trial court as follows:

"1.  The defendant company issued the policy described in the petition of plaintiffs, in the amount of $2200, covering the items of property therein alleged, and afterwards the property was, as alleged, destroyed by fire; that plaintiff made up and furnished defendant full proof of loss as therein alleged, and that the property was of the value at the time of the fire as alleged by plaintiff, and shown on schedule or list attached as an exhibit to plaintiff's petition, and that the damage by fire to the engine and boiler complete, including steam and water fittings, was in the amount alleged by plaintiff and shown on said exhibit, and that on September 14, 1899, defendant denied all liability under said policy, refused to pay the claim sued on, and has never paid the same, and the amount now due the plaintiff therein is the sum of $2354.

"2.  The gin plant in question was on October 5, 1898, purchased

by plaintiff P. D. Harris from C. C. Epps for a total consideration of $3200, of which was the cancellation of $900 and interest due from Epps to Harris, and the assumption by Harris of debts due by Epps to other parties,—aggregating in all $3200. The plant, including all machinery, houses, tools, repairs, etc., cost Epps, approximately $4000.

"The gin plant had been reasonably profitable for the two preceding gin seasons. The testimony as to the horse power of the engine is conflicting and unsatisfactory, and it can not with reasonable accuracy be determined therefrom the horse power of the engine, but I find that the application of Harris for the insurance in question was in this as well as in other respects substantially true, and not false in a sense material to the risk.

"That in the sale from Epps to Harris the items of property were not separately priced or valued, but $3200 was a lump sum, of which the boiler and engine would represent about $600 of the total consideration. The boiler in question was purchased second-hand by Epps; was overhauled and repaired by him and reset. There is no evidence as to how long it had been in use prior to the time Epps became owner of it. The engine in question had been operated by Kennedy & Husbands and by Harris prior to his sale to Epps, and it had been used much longer than three years. After Harris sold to Epps the engine was reworked and renewed by him, and had been in use only two years after its renewal. The engine and boiler, up to the close of the ginning season of 1898, performed their functions and furnished the motive power to operate this gin plant.

"One of the gin stands was new, and the other two were old gin stands, reworked and repaired to the extent of being practically new. The application, as to the length of time the engine and boiler and gin stands had been in use, was true, counting from the time of their being overhauled and reworked, but not true as to the engine and two of the gin stands, counting from the time these pieces of machinery were first operated.

"I conclude, however, that the application was substantially true on all these points, and not false in a material particular. In the purchase by Harris from Epps the press would be reasonably estimated at $450, in view of the total consideration of $3200. Epps had changed a single to a double box press, furnished new parts and done considerable work thereon, which would give the press a reasonable value of $450, on a basis of $3200 for the entire plant.

"In the application for this insurance Harris agreed that he would keep a barrel of not less than forty gallon capacity, filled with salt water, with two galvanized iron buckets to each gin,—barrel and buckets to be kept in the gin room at all times.

"At the close of the ginning season of 1898 only two gin stands were being operated, and at that time the barrels with water and buckets were kept in the gin room, in accordance with the agreement, but after the ginning season closed, along in February, 1899, the water in the bar-

rels froze, after which they would not hold water, and at the time of the fire on August 11, 1899, the testimony shows that the barrels were incapable of holding water.

"That defendant charged a basis rate for gin risks of this kind of $3.50 per hundred, and added an additional sum for certain deficiencies, among which is No. 9, as follows: 'Inadequate supply of barrels and buckets, $1 per hundred.'

"The policy sued on was issued near the close of the ginning season of 1898, and would have expired before the opening of the next succeeding season, and at the time of the fire the gin had not been operated since the close of the season in 1898. P. D. Harris, the owner, lived at Neyland, twenty miles from the plant in question, and the contract in question nowhere required Harris to keep a watchman at the plant; hence I find that the agreement with reference to the barrels and buckets was not intended to be operative except during the actual operation of the gin plant, and they were not violated in a manner material to the risk. That Harris, in his proof of loss, was not guilty of false swearing; that in making up the proofs he sought information as to values from those experienced in the prices and values of such property and made out his proofs with this aid, and as to the Keating mortgage, Harris did not know at that time that it ever had existed. The proof showed that at the time Epps sold out to Harris, the Keating Implement Company held a mortgage on the press in question to secure a debt of $75. Harris knew of the existence of this debt, and assumed it, but was ignorant of the mortgage. After Harris purchased from Epps, and before the policy sued on was issued, Harris settled off the Epps notes by giving to Keating his note instead, but did not renew the mortgage.

"(3) The several provisions of the policy and application quoted in the pleadings of both plaintiff and defendant are correctly quoted, and form parts of the contract; hence it would serve no useful purpose to copy them in full in these findings.

"(4) F. V. Ende had been for a number of years prior to the issuance of this policy, and was then, the agent of the defendant company at Greenville, Texas, with full power and authority from defendant to solicit insurance on its behalf, take applications therefor, issue policies, except gin risks as stated below, deliver policies, examine and inspect risks, receive and collect and transmit premiums of insurance. That the said F. V. Ende was in all respects the general agent of the defendant, unless by the terms of the contract his authority was limited with reference to gin risks. As to gin risks Ende had authority from defendant to do all these things mentioned above, except to write or issue the policy. This was done by the State agents of the defendant at Dallas, on application solicited, taken, and sent in by Ende or under his authority, and after the policy was issued it was sent by the State agents to Ende, who delivered same and collected premiums therefor, and transmitted the same to defendant's State agents. W. F. Balthrop was a solicitor working for Ende, and the application in question was writ-

ten by Balthrop, at the instance and under the employment of F. V.
Ende, and the same showed upon its face that Balthrop, as solicitor,.
took the same and inspected the risk.   The clauses in the contract in-
tending to limit the authority of Ende with reference to gin risks are
quoted correctly in defendant's second amended supplemental answer,.
filed October 16, 1900, and the same are referred to as a part of this
finding, instead of writing them here at length.

"(5)   On August 15, 1898, while C. C. Epps was owner of the prop-
erties in question, he made, through F. V. Ende, application in writing
to defendant for $2200 insurance thereon, which was granted and the
insurance issued to him for one year in that amount.

"At the time this application was taken, Epps, together with Lowen-
stein, who was interested as a lien creditor, went to Ende and then ex-
plained to him fully all about the property.   They told him that the
engine and two gin stands had been operated by Kennedy & Husbands
prior to the time Harris purchased from them; that Harris sold to Epps,.
and afterwards Epps had the engine repaired and renewed; that the
gin stands had been reworked and renewed by Lowenstein; that a new
gin stand complete had been added by Epps, and another second-hand
boiler purchased, repaired and reset, and the press changed from single
to double box, with new parts added, such as shafting, belting, elevators,
etc., making the plant complete.   Also they told Ende of all incum-
brances existing on the property, including the Keating mortgage of
$75 on the press; in fact, told Ende in good faith the history, age, and
condition of the property, and from the answers there given Ende wrote
the application which was sent in to defendant's general agents at
Dallas, who issued the policy and sent it to Ende, who delivered same to
assured, collected the premium therefor, and transmitted same to de-
fendant's general agents.

"(6)   When Harris repurchased the property from Epps on October
5, 1898, he sought to have the Epps policy transferred to him, but in-
stead of indorsing transfer on the policy, defendant required a new
application to be made by Harris, which was taken by W. F. Balthrop,.
solicitor from Ende's office, and a new policy issued to Harris for the
unexpired portion of the year for which the Epps policy had been issued.
Balthrop secured some of the information upon which he filled up the
application from K. L. Lowenstein, of Greenville, and then went out to
Neyland, where Harris lived, to finish the application.   Harris at the
time was busy at work, and Balthrop was in a hurry to catch a train re-
turning in about thirty minutes, and owing to these facts and the
further fact that the application was regarded as rather formal in order
to work transfer of the insurance from Epps to Harris, there was not
that deliberation in taking this application as an ordinary original ap-
plication.   Some of the questions, such as the make, size, etc., of the
machinery, Harris did not know, and referred Balthrop to Lowenstein
for the information.   The method of taking the application was:   That

Balthrop would ask the question to be answered, and when the full answer or explanation was made to him, he selected the language to be written in the blanks left therefor in the application. These blanks are too small to admit of extended answers being written, and necessarily contemplated terse, short, concrete responses.

"The evidence fails to show that any material fact or circumstance was withheld from Balthrop in taking the application, but that similar information was furnished him by Harris and Lowenstein regarding the age, history, and condition of the property and incumbrances, as was given Ende when the Epps application was taken, and I find that the Epps and Harris applications are substantially the same, that is, while there are minor differences, they are not materially inconsistent.

"(7)    After the destruction of the property by fire, which occurred August 11, 1899, a special agent of the defendant, a Mr. Zincraft, came to Greenville, and went down to the remains in company with plaintiff Harris in order to investigate the loss. After viewing the remains, he and Harris returned to Greenville; Zincraft said nothing to Harris about settlement, but that same evening or next day, having received some other information regarding the loss, he, in company with a notary public, returned to the neighborhood of the remains and interviewed a number of persons who have subsequently testified as witnesses, from which he elicited the information and facts upon which defendant had predicated its defense.

"After several days waiting, and hearing nothing, Lowenstein and Harris went to Ende, told him they had heard nothing from the defendant about the adjustment, and asked him what to do, or what they ought to do, and Ende suggested to them that if the company would not settle, their policy provided for the making of proof of loss, and they had better follow the policy.

"After this Harris employed an attorney and made up proof of loss in accordance with the provisions of the policy, and sent it to defendant. I find that on the 8th day of October, 1898, P. D. Harris made a written application to the Delaware Insurance Company, which said application contained the following questions, with the following answers respectively thereto: 'Sixth Q. Has your gin been profitable the last two years? A. Yes. Q. What is the horsepower of the boiler? A. 40.    Engine? A. 30.    Q. What did you pay for the boiler and engine? A. $600. Q. How long has the boiler been in use? A. Two years. Q. Engine? A. Three years.

" 'Machinery: Q. How many gin stands in actual use? A. Three. Q. How many seasons has each been used? A. New. Q. When last repaired. A. This season.

" 'Incumbrance and indebtedness: Q. Do you owe anything on this entire property or any part thereof, either land, buildings, or machinery? A. Yes. Q. If so, to whom? A. Hall Gin Company. Q. How much? A. $1100. Q. When due? A. 1898, 1899, and 1900.

Q. Is above indebtedness, if any, secured by mortgage or other lien? A. Yes. Q. If yes, state what property is included under such mortgage or lien, and give present cash value thereof. A. Entire plant.'

"Said application contained a warranty, and limitation of authority as set out in the defendant's pleadings, and also the following at the bottom: 'Important question to be answered in applicant's handwriting only. a. Did you read statement and agreement, write the answers to the questions in this application, and fill in the description of the property, estimated valuations, and amounts to be insured, yourself? A. No. b. Q. If not, have you read over the statements, agreements, questions and answers, descriptions, valuations, and amounts as set forth above, and do you understand them, and adopt them as your own? A. Yes.

" 'Dated at Neylandville, Texas, this the 8th day of October, 1898. P. D. Harris, Applicant.'

"C. C. Epps made an application entirely similar to the one made by Harris, to the same company, and there was no substantial difference between the questions and answers in that application, and that of Harris.

"Neither F. V. Ende of W. F. Balthrop had any express authority from the defendant insurance company to do anything in regard to gin risks, except to take applications and forward same to the general agents of the company, and deliver the policy, and collect and remit the premiums, if the policies were issued. That their authority was expressly limited in the application and the policy, as set out in defendant's pleadings. Whatever other authority they had to bind the company, I consider they had as a matter of law, as shown in the conclusions of law herewith filed.

"Trezevant & Cochran, the general agents of the defendant company, had no actual notice or knowledge of the history, condition, age, size, or values of the property insured, except what was given them in the application of C. C. Epps and P. D. Harris, but that F. V. Ende and W. F. Balthrop did each have actual knowledge of the condition, age, etc., of the insured property as hereinafter found."

*Opinion.*—The insurance company resists a recovery by appellee on the ground that certain statements made by appellee in his application for insurance were untrue; that said statements were warranties, and upon the faith of the statements made in said application the policy was issued. The application was made a part of the policy.

The appellee, to relieve himself of the terms of the application, plead in the court below in effect as follows: "That the person taking the application is the agent of the insurance company; that he was familiar with every item of the property, its age, condition, and value; that the agent had inspected the property; that he had taken an application for insurance from the former owner only a very short time previous upon which the company issued a policy of insurance; that assured was not

familiar with the property and the agent knew this; that the object of
taking the application was simply to work a transfer of the insurance
from the former owner to the assured; that the agent had authority to
do any and all acts necessary to procure the contract of insurance; that
in doing so the agent wrote the answers in the application himself, and
promised that before forwarding the application he would see parties who
also knew the property and verify the answers as written; that assured
in good faith told the agent all he knew about the property and informed
him that he could not give answers correctly; that the agent was in a
great hurry to procure assured's signature in order to catch a train; that
if the application contained any limitation on the agents authority, he
knew nothing of the fact; that no part of the application was read to
him; that he did not read the same or any part thereof, and had no time
to do so; that he relied on the agent to get and write the answers cor-
rectly and to verify the facts, and that the agent promised to do this;
that if the application contained statements that are not true, the same
is a mistake, and is a mistake of the agent; that under the circumstances
mentioned the application was signed in ignorance of any limitation of
the authority of the agent in the premises."

Special exceptions were filed attacking this plea, which were over-
ruled, and the court permitted the introduction of proof to establish the
allegations therein contained. The appellant attacks the rulings of the
court in the particulars named. The policy, together with the applica-
tion, according to their terms, constituted the contract between the par-
ties, and are binding unless some good and legal cause exists which would
relieve appellee from the effects thereof. The fact that appellee did not
read the application and knew nothing of its provisions was not sufficient
under the circumstances to authorize the court in holding that appellee
was not bound by the terms of contract entered into by him. Insurance
Company v. Halcomb, 34 S. W. Rep., 918; Insurance Company v. Morri-
son, 69 Texas, 353; Joyce on Ins., sec. 1974.

The application fully set forth the extent of the agent's authority, and
as appellee is bound by the terms thereof, he must be held to know the
extent of that authority, and he can not avoid the force of the terms of
the contract upon anything said or done by the agent outside of the ex-
press authority delegated to him by the insurance company as shown by
the contract itself. Railway v. Best, 55 S. W. Rep., 315; Insurance Co.
v. Mize, 34 S. W. Rep., 670; Insurance Co. v. Kempner, 87 Texas, 229;
Insurance Co. v. Sampson, 88 Texas, 333; Insurance Co. v. Harris, 57
Texas, 635.

Appellee contends that "notice of any matter to a person authorized
by the general agents of an insurance company to solicit insurance, take
and report applications to the general agents, deliver the policies and
collect the premiums, is notice to the company." This is a correct propo-
sition of law where the agent was acting in the apparent scope of his
authority, and no notice of his real authority, if limited, was given to
the insured. This court held this proposition of appellee to be correct in

Insurance Company v. Everett, 18 Texas Civil Appeals, 514. In that case, however, there were no facts showing notice to the insured of any limitation on the agent's authority, or if any, as to the subject of the contract. In the case under consideration the insured was put upon notice that the issuance of the policy was to be based solely upon the statements in the application, and that the agent taking the application had no power to waive the conditions of the policy. With notice of the agent's real authority, it was the duty of appellee to see that the statements made were correct, and not having done so, he can not now claim that the conditions are waived because the agent who took the application knew the facts.

It is also insisted by appellee that under the law the appellant could not limit the power of its soliciting agents to bind it by notice of any information received in procuring the contract of insurance, citing Revised Statutes, article 3093. In Insurance Company v. Walker, 2 Texas Court Reporter, 242, our Supreme Court holds that said article is not applicable, except "as far as relates to all the liabilities, duties, requirements, and penalties set forth in this act," the act referred to being a revenue act passed by the Legislature in 1879. The case at bar does not fall within the provisions of said article.

While in our opinion the appellee was bound by the terms of the contract, and the action of the court in overruling the demurrers was error, yet as the case was tried before the court without the intervention of a jury, it is immaterial. The disposition of the case depends upon the issue whether or not the statements in the application which are alleged to be false are warranties or representations, and, if false, are such as will annul the policy, regardless of their materiality to the risk? Where it clearly appears from the terms of the contract that the statement of the insured are to be considered and treated as warranties, then, if false, the policy becomes nonenforcible; and whether such statements were made in good faith, or are material to the risk, is immaterial. Where, however, there is language in the contract which will warrant the inference that a forfeiture will not be insisted upon where the statements, though false, are not material to the risk, the courts will construe such statements as representations, and will not forfeit the policy unless material to the risk. There are provisions of the contract under consideration which would make the statements made by the insured in his application warranties were it not for another provision of the policy which is as follows: "This entire policy shall be void if the insured has concealed or misrepresented in writing or otherwise any material fact or circumstance concerning this insurance or the subject thereof," etc. In the case of Assurance Company v. Munger Manufacturing Company, 92 Texas, 297, where the contract of insurance was identically, or substantially, the same as in this case, the Supreme Court of this State construed the above language as showing that in making the contract it was not "intended to make the binding force of the policy dependent upon the

absolute truth of each statement," but that the force of the policy was dependent upon the statements being substantially true.

We therefore conclude that the statements made by the insured and relied on as grounds of forfeiture were not warranties, but representations. The inquiry then is, whether or not the statements were untrue in such material particulars as to annul the policy? The application contained, among other things, statements in answer to questions relating to the length of time certain machinery had been in use; that the boiler had been in use two years; the engine three years, and that the three gins in actual use were new. The evidence shows that all the machinery had been in use for a number of years longer than the periods stated by the insured, and his answers were not literally true. It further shows that all of it had been reworked, refitted, and rebuilt, and made practically as good as new, and was of the value as represented in the application. The court below found that the statements were substantially true, and not false in any material particular. This conclusion was warranted by the evidence, and the court did not err in so holding.

The application signed by the insured required him to keep three barrels of forty gallons capacity filled with water, and two buckets with each barrel, at all times in the gin room. This requirement was complied with during the time the gin was in operation. At the time of the fire the gin was not in operation, and had not been for some time prior thereto. The barrels had become dry and incapable of holding water. There is nothing in the evidence tending to show that the failure to have barrels of water in the gin room contributed to the loss. No one was present at the fire. Several witnesses testify that they live a quarter or half mile from the gin and saw the fire; that when they first saw it they thought it could have been extinguished with "water from barrels thrown on with buckets," but they do not state that they went to the fire, or that anyone was in a position to have used water from the barrels, had any been there. As the evidence does not show that the presence of water in the barrels would have in any way tended to prevent the loss, and in view of the terms of the contract, we are of the opinion that the failure to keep water in the barrels was not such a breach of the contract as will prevent a recovery.

. The remaining proposition we deem necessary to discuss is the contention of appellant that the policy was forfeited by reason of the insured concealing the existence of a mortgage on part of the property at the time the contract of insurance was entered into. The policy contained a clause as follows: "This entire policy  *  *  *  shall be void  *  *  * if the subject matter of insurance be personal property and be or become incumbered by a chattel mortgage." The policy specifies the property and the amount of insurance as follows:  "(1)    $300 on one and one-half story frame building," with further description of the house; "(2)    $1600 on fixed and movable gin machinery of all kinds, excepting engines and boiler and appurtenances, including," etc. The machinery is

described, among which is embraced a cotton press. "(4) $300 on engine and boiler including" certain appurtenances.

The insured in his application, in answer to the question about incumbrances on the property, stated that he owed the Hall Gin Company $1100 which was secured by a mortgage on the entire property. The insured had bought the property from one Epps, who owed $75 to the Keating Implement Company, and which amount was secured by a lien on the cotton press. Harris assumed this debt, and subsequently executed his note to the Keating Implement Company for same. At the time he did this he knew nothing about the mortgage, and nothing was said about it when he gave his note to the Keating Implement Company. If it be conceded that the mortgage existed on the press at the time the policy was issued, under the contract the failure to disclose the existence did not render the policy void. The principle here involved falls within the case of Bills v. Insurance Company, 87 Texas, 547, which holds contrary to the contention of the appellant.

The judgment is affirmed.

*Affirmed.*

Writ of error refused.